UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEMMA ROY BREEDING,

       Plaintiff,                   Hon. Paul L. Maloney

v.                                  Case No. 1:07 CV 971

NANCY LANGE, et al.,

       Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on <u>Defendants Correctional Medical Services, Inc., Raymond Gelabert, M.D., and Margaret Ouellette, P.A.'s Motion to Dismiss and for Summary Judgment</u>. (Dkt. #77). Pursuant to 28 U.S.C. § 636(b)(1)(B), the Court recommends that Defendants' motion be **granted**.

## BACKGROUND

The following allegations are contained in Plaintiff's complaint.[1] On March 16, 2000, Plaintiff transferred to the Lakeland Correctional Facility. (Complaint at ¶ 2). Soon thereafter, Plaintiff was examined by Dr. Malatinsky, who concluded that Plaintiff "had a definite problem with [his] knees." (Complaint at ¶ 3). Dr. Malatinsky arranged for Plaintiff to be examined by Dr. Ikrim, who performed

---

[1] The Court notes that Plaintiff's complaint makes reference to numerous exhibits, none of which have been submitted to the Court.

surgery on Plaintiff's knees on February 1, 2001. (Complaint at ¶¶ 3-4). Dr. Ikrim informed Plaintiff that he may require knee replacement in the future. (Complaint at ¶ 4).

On March 6, 2003, Plaintiff was examined by Dr. Arora, who recommended that Plaintiff undergo bilateral knee replacement. (Complaint at ¶ 9). Plaintiff's subsequent requests to be examined by an orthopedic surgeon, however, were denied. (Complaint at ¶¶ 10-13). On May 19, 2003, Plaintiff was informed that Defendant Olney had concluded that before undergoing knee replacement surgery Plaintiff must lose weight. (Complaint at ¶ 13).

On July 6, 2003, Plaintiff reported to Health Services that "it felt like [he] had something sticking out of [his] right knee." (Complaint at ¶ 17). On July 11, 2003, Plaintiff was examined by Nurse Aston. (Complaint at ¶ 18). X-rays of Plaintiff's knee were subsequently requested by Physician's Assistant Kimball. (Complaint at ¶ 19). On September 18, 2003, Plaintiff submitted a request for treatment to Health Services, which provided Plaintiff with anti-inflammatory medication. (Complaint at ¶ 23).

On October 2, 2003, Plaintiff requested that he be examined by an orthopedic surgeon. (Complaint at ¶ 24). A "few days later" Plaintiff was examined by Defendant Olney. (Complaint at ¶ 25). Plaintiff informed Olney that he wanted to be examined by an orthopedic surgeon and that he "would not accept his lame excuses any longer." (Complaint at ¶ 25). Defendant Olney indicated to Plaintiff that he would "make the appointment." (Complaint at ¶ 25). X-rays of Plaintiff's knees taken on November 7, 2003, revealed that "no gross abnormalities existed." (Complaint at ¶ 27).

On December 30, 2003, Plaintiff was examined by orthopedic surgeon, Dr. Mishra, who concluded that Plaintiff required bilateral knee replacement. (Complaint at ¶ 33). On March 29, 2004, Plaintiff underwent right knee replacement surgery performed by Dr. Mishra. (Complaint at ¶¶ 42, 44,

51). Following this surgery, Dr. Mishra was "upset" because "in his opinion, what CMS, the MDOC, and LCF's Health Services did to [Plaintiff] by stalling the surgery, bordered on criminal negligence." (Complaint at ¶ 43). On April 14, 2004, Plaintiff was examined by Dr. Mishra, who reported that Plaintiff "was doing fine." (Complaint at ¶ 47). Plaintiff was instructed to continue his rehabilitation efforts. (Complaint at ¶ 47).

On June 3, 2004, Plaintiff was again examined by Dr. Mishra, who "released [Plaintiff] from his care with instructions to wait 90 days, and then start the process to have the left knee replaced." (Complaint at ¶ 51). On September 15, 2004, Plaintiff was examined by an unidentified doctor who informed Plaintiff that "he would go ahead and schedule [Plaintiff] to see Dr. Mishra, so [he] could get the left knee done." (Complaint at ¶ 54). Defendant Correctional Medical Services (CMS) denied Plaintiff's request to be examined by an orthopedic surgeon on the grounds that he first needed to lose weight. (Complaint at ¶¶ 55-72). Plaintiff successfully appealed this determination and was examined by Dr. Mishra on May 12, 2005. (Complaint at ¶¶ 72-75).

On August 8, 2005, Plaintiff underwent left knee replacement surgery performed by Dr. Mishra. (Complaint at ¶ 79). Plaintiff was discharged from the hospital on August 13, 2005, with instructions to begin participating in physical therapy. (Complaint at ¶ 80). On August 21, 2005, Plaintiff submitted a kite to Health Services "asking when physical therapy was to begin." (Complaint at ¶ 83). A nurse later informed Plaintiff that "CMS was not doing their job as far as getting physical therapy started." (Complaint at ¶¶ 83-84). Plaintiff began participating in physical therapy on August 31, 2005. (Complaint at ¶ 90).

On June 28, 2006, Plaintiff submitted a kite to physician's assistant Ouellette so that he could be examined "about the continual problems with [his] left knee." (Complaint at ¶ 127). An

appointment was scheduled for Plaintiff to be examined by Defendant Ouellette. (Complaint at ¶ 127). This appointment was cancelled and Plaintiff was instead scheduled to be examined by a doctor on July 7, 2006. (Complaint at ¶ 128). This appointment was subsequently cancelled. (Complaint at ¶ 128). On July 21, 2006, Plaintiff was examined by a nurse, who determined that Plaintiff needed to be examined by a doctor. (Complaint at ¶ 132).

On August 11, 2006, Plaintiff was examined by Defendant Gelabert. (Complaint at ¶ 135). Dr. Gelabert "examined [Plaintiff's] left knee and ordered x-rays, stating he definitely felt that with a lack of ROM, and the swelling, that something was wrong and quite possibly needs fixing." (Complaint at ¶ 135). On September 11, 2006, Plaintiff was again examined by Dr. Gelabert. (Complaint at ¶ 143). The doctor informed Plaintiff "that instead of doing the proper thing, he was going to add medication for pain relief." (Complaint at ¶ 143). Dr. Gelabert further stated that he would "not do anything else." (Complaint at ¶ 143).

On November 15, 2006, Plaintiff was examined by Defendant Ouellette, who, after examining Plaintiff's left knee, stated that "she would approach CMS about an Orthopedic appointment." (Complaint at ¶¶ 165, 182).

On January 5, 2007, Plaintiff "stumbled" and "twisted" his left knee. (Complaint at ¶ 179). Plaintiff submitted a kite to Health Services "because it felt like needles were sticking it and it was on fire." (Complaint at ¶ 179). On January 8, 2007, Plaintiff was informed that he had "a pending appointment." (Complaint at ¶ 181). Plaintiff was examined by nurse Pfost on January 10, 2007. (Complaint at ¶ 182). Plaintiff did not want to be examined by a nurse, but instead requested that he be examined by a doctor as Defendant Ouellette had suggested. (Complaint at ¶ 182). According to Plaintiff, Defendant Ouellette "failed to get with CMS about seeing the Orthopedic, Dr. Harmon."

(Complaint at ¶ 182). Plaintiff subsequently submitted a kite to Defendant Ouellette "about this oversight of not bothering to attempt to get me an appointment with Dr. Harmon." (Complaint at ¶ 183). On January 19, 2007, Defendant Ouellette informed Plaintiff that an appointment with Dr. Harmon had been scheduled. (Complaint at ¶ 183).

Plaintiff was examined by Defendant Ouellette on February 5, 2007. (Complaint at ¶ 185). When Plaintiff asserted that there were "bone fragments" in his knee, Ouellette responded that "she would check into it." (Complaint at ¶ 185). On May 7, 2007, Plaintiff was examined by Defendant Ouellette for his "chronic care and disability clinic." (Complaint at ¶ 195). When Plaintiff "brought up the issue with [his] knees, [Ouellette] did the clinic and then dismissed [him], as she did not wish to talk about it." (Complaint at ¶ 195).

Plaintiff initiated this action on September 27, 2007, against the Michigan Department of Corrections (MDOC) and Correctional Medical Services (CMS), as well as the following individuals: Nancy Lange, Dr. Frank Olney, Dr. Donald Parkhurst, Dr. Raymond Gelabert, Steven Winchester, Jacklyn Jackson, Jim Armstrong, Margaret Ouellette, and Mary Ann Schorfhaar. Plaintiff alleges that he was denied appropriate medical treatment in violation of his Eighth Amendment rights. Plaintiff seeks more than $159,000,000 in money damages.

Defendant Olney previously moved to dismiss Plaintiff's claims as untimely. (Dkt. #26). Defendants Armstrong, Lange, Parkhurst, Schorfhaar, Winchester, and MDOC also previously moved for summary judgment. (Dkt. #47). The undersigned has recommended that both motions be granted. (Dkt. #59). Defendants CMS, Gelabert, and Ouellette now move to dismiss Plaintiff's claims or, in the alternative, for summary judgment.

**STANDARD**

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all Plaintiff's allegations and construe the complaint liberally in his favor. *See Herron v. Harrison*, 203 F.3d 410, 414 (6th Cir. 2000). Furthermore, complaints filed by pro se plaintiffs are held to an "especially liberal standard, and should only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party has met its burden of production, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the nonmoving

party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

## ANALYSIS

**I.      Defendant CMS**

CMS is not vicariously liable for the actions of its employees and, therefore, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658,

694 (1978)); *Street v. Corr. Corp. of America*, 102 F.3d 810, 818 (6th Cir. 1996); *Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir., Mar. 26, 2001). To establish liability against CMS, Plaintiff must demonstrate that he suffered a violation of his federal rights "because of" a CMS policy, practice, or custom. *See Thomas*, 398 F.3d at 429. Plaintiff has not alleged that his injuries resulted from any CMS policy, practice, or custom. Accordingly, the Court recommends that Plaintiff's claims against CMS be dismissed.

II.     **Defendant Gelabert**

Plaintiff claims that Defendant Gelabert failed to provide him appropriate medical treatment in violation of his Eighth Amendment rights. The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations which occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle*, 429 U.S. at 101-02. Accordingly, the Eighth Amendment protects against the unnecessary and wanton infliction of pain, the existence of which is evidenced by the "deliberate indifference" to an inmate's "serious medical needs." *Estelle*, 429 U.S. at 104-06.

The analysis by which Defendant's conduct is evaluated consists of two-steps. First, the Court must determine, objectively, whether the alleged deprivation was sufficiently serious. In this respect, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. If the objective test is met, the Court must then determine whether the official possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could

> be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

In other words, Plaintiff must establish that Defendant "was subjectively aware of the risk" Plaintiff faced and "disregard[ed] that risk by failing to take reasonable measures to abate it." *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 829, 847).

It must be remembered, however, that the Eighth Amendment is not a vehicle by which to constitutionalize state tort law. To the extent, therefore, that Plaintiff merely disagrees with Defendant's treatment decisions or claims that such constitute malpractice, Plaintiff fails to state a claim of constitutional magnitude. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)) ("[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Brown v. Kashyap*, 2000 WL 1679462 at *1 (6th Cir., Nov. 1, 2000) (citing *Estelle*, 429 U.S. at 106) ("allegations of medical malpractice or negligent diagnosis and treatment" do not implicate the Eighth Amendment); *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995) (if prison officials responded reasonably to a substantial risk to an inmate's health or safety, they may avoid liability – even if the harm ultimately was not averted).

Defendant Gelabert has submitted an affidavit in which he asserts that he first examined Plaintiff on August 11, 2006. (Dkt. #77, Exhibit C). Defendant Gelabert asserts that during this examination, Plaintiff complained of left knee pain. An examination of Plaintiff's left knee revealed limited range of motion, but no evidence of swelling or effusion. Gelabert provided Plaintiff with anti-inflammatory and pain medication and also instructed him to perform "stretching and strengthening exercises." Defendant Gelabert also ordered further x-rays of Plaintiff's left knee, which were taken on August 22, 2006. Defendant Gelabert reviewed these x-rays on August 31, 2006, and concluded that

Plaintiff was experiencing "arthritic changes in the patella and calcification in the post compartment of the knee." On September 11, 2006, Defendant Gelabert examined Plaintiff. The doctor diagnosed Plaintiff with "arthritis of the left knee after his bilateral knee replacements." Defendant Gelabert modified Plaintiff's medication regimen. *Id.* The assertions in Defendant Gelabert's affidavit are consistent with information contained in Plaintiff's medical record. (Dkt. #77, Exhibit B at pages 6, 9, 397-99[2]).

In response to the evidence submitted by Defendant Gelabert, Plaintiff has submitted no evidence to the contrary, but instead simply relies on the allegations and conclusions asserted in his complaint. The evidence submitted by Defendant Gelabert reveals that he was not deliberately indifferent to Plaintiff's medical needs. Rather, as is evident from Plaintiff's various pleadings, he is simply unhappy with the treatment he received from Defendant Gelabert. As previously noted, however, such fails to implicate the Eighth Amendment. Accordingly, the Court recommends that Defendant Gelabert's motion for summary judgment be **granted**.

### III.        Defendant Ouellette

Plaintiff claims that Defendant Ouellette failed to provide him appropriate medical treatment in violation of his Eighth Amendment rights. The evidence submitted by Defendant Ouellette reveals that she is also entitled to summary judgment.

Defendant Ouellette, a physician's assistant, has submitted an affidavit in which she asserts the following. (Dkt. #77, Exhibit D). She first examined Plaintiff on November 15, 2006. During this examination, Plaintiff complained that his left knee occasionally "snaps backward." Plaintiff

---

[2] These page numbers refer to the Bates numbers located in the lower right hand corner of the items in this exhibit.

requested to be examined by an orthopedic physician. After examining Plaintiff's left knee, Defendant Ouellette instructed Plaintiff to "continue his range of motion exercises." Defendant Ouellette also ordered that Plaintiff receive various housing, work assignment, and medical equipment accommodations.

On February 5, 2007, Defendant Ouellette examined Plaintiff as part of his "Disability and Cardio Chronic Care Clinic appointments." During this examination, Plaintiff "did not raise any subjective complaints with respect to his knees and [Plaintiff] stated that he had no change in functional capacity." Plaintiff "asked if he was going to see an orthopedic specialist," to which Defendant Ouellette responded that "because he was doing well, there was no need for him to see a specialist." Defendant Ouellette recommended that Plaintiff receive various housing, work assignment, and medical equipment accommodations.

On May 7, 2007, Defendant Ouellette examined Plaintiff as part of his "Gastrointestinal, Disability, and Cardio Chronic Care Clinic appointments." During this examination, Plaintiff "did not raise any subjective complaints regarding his knees and reported that he was noncompliant with his treatment and had no change in functional capacity." Defendant Ouellette again recommended that Plaintiff receive various housing, work assignment, and medical equipment accommodations.

On September 17, 2007, Defendant Ouellette reviewed x-rays of Plaintiff's left knee taken the previous month. After reviewing these x-rays, Ouellette "scheduled an appointment to evaluate [Plaintiff]." On October 1, 2007, Defendant Ouellette examined Plaintiff. During this examination, Plaintiff "did not raise any subjective complaints of problems with his knees, and again reported that he had no change in functional capacity." Plaintiff "wanted to know when he would be

evaluated for his left knee pain and why a CT scan had not been ordered." Defendant Ouellette "advised [Plaintiff] that the matters would be discussed with someone at CMS."

On November 30, 2007, Plaintiff was examined by Defendant Ouellette. Plaintiff reported that he was experiencing "problems with his left knee." Ouellette "ordered x-rays of [Plaintiff's] left knee and renewed all of his medications." On December 5, 2007, Defendant Ouellette met with Plaintiff to discuss the x-ray results. Defendant Ouellette concluded that Plaintiff may be experiencing "loosening of the left knee component" which she would discuss with CMS. Defendant's Ouellette's attempts to discuss Plaintiff's circumstance with CMS were unsuccessful, however, because of a staffing vacancy at CMS.

On January 15, 2008, Defendant Ouellette discussed Plaintiff's case with a CMS physician who recommended that Ouellette "submit an authorization request for an orthopedic consultation." Two days later Ouellette submitted such a request. The request was approved on January 31, 2008, and Plaintiff was examined by an orthopedist on February 19, 2008. The doctor indicated that he wanted to examine the most recent x-rays of Plaintiff's left knee before examining him again.

On February 25, 2008, Defendant Ouellette submitted another request for Plaintiff to be afforded an orthopedic consultation. This request was authorized and Plaintiff was examined by an orthopedist on April 16, 2008. The doctor recommended that Plaintiff undergo a bone scan and CT scan. Defendant Ouellette submitted requests so that Plaintiff could undergo these procedures. Plaintiff subsequently participated in a bone scan and CT scan, the results of which revealed that "the left tibial prosthesis was in place and that there was no loosening of the prosthesis."

After examining Plaintiff on June 27, 2008, Defendant Ouellette submitted another request for Plaintiff to be examined by an orthopedist. This request was denied, however, because "there

was no evidence of the prosthesis loosening." Defendant Ouellette also examined Plaintiff on three occasions in August 2008.

The assertions in Defendant Ouellette's affidavit are consistent with information contained in Plaintiff's medical record. (Dkt. #77, Exhibit B at pages 213-17, 250-53, 283-87, 456, 462-64, 582, 593, 595, 597-99, 746-49, 752-55, 832, 835; Dkt. #77, Exhibit E at pages 43-46, 69-70, 73-74, 82-83, 89-93, 95, 99[3]). Plaintiff has submitted no evidence in response to Defendant Ouellette's submissions, but instead has chosen to rely on the allegations and conclusions asserted in his complaint and other pleadings. The evidence submitted by Defendant Ouellette clearly demonstrates that she was not deliberately indifferent to Plaintiff's medical needs. Instead, Plaintiff is simply unhappy with the treatment he received. As previously discussed, however, such does not implicate the Eighth Amendment. Accordingly, the Court recommends that Defendant Ouellette's motion for summary judgment be **granted**.

## CONCLUSION

For the reasons articulated herein, the Court recommends that <u>Defendants Correctional Medical Services, Inc., Raymond Gelabert, M.D., and Margaret Ouellette, P.A.'s Motion to Dismiss and for Summary Judgment</u>, (dkt. #77), be **granted**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file

---

[3] These page numbers refer to the Bates numbers located in the lower right hand corner of the items in these exhibits.

objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: July 9, 2009                   /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge